Filed 10/4/22  In re E.T. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| In re E.T., a Person Coming Under the Juvenile Court Law. | B315104 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.T.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. Nos. 19CCJP05355, 19CCJP05355A) |

APPEAL from orders of the Superior Court of Los Angeles County, Hernan D. Vera, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Kimberly Roura Deputy County Counsel, for Plaintiff and Respondent.

---

Mother R.T. appeals from the juvenile court's order terminating her parental rights over her daughter, E., following a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  She argues that the trial court erred in dismissing her section 388 petition alleging changed circumstances without a hearing.  She further contends that in terminating parental rights and determining that the parental benefit exception did not apply, the trial court considered improper factors and failed to account for mother's bond with the child.  We find no error in the trial court's orders.

Mother also contends the juvenile court's finding that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) did not apply was erroneous because it was predicated upon a defective ICWA inquiry by the Los Angeles County Department of Children and Family Services (DCFS). We agree with mother that DCFS failed to conduct an appropriate inquiry into E.'s possible Native American heritage.  We agree with DCFS, however, that the error was harmless.  Applying the standard articulated in *In re Dezi. C.* (2022) 79 Cal.App.5th 769, review granted Sept. 21, 2022, S275578 (*Dezi C.*), we conclude the record contains no information suggesting a reason to believe E. may be an Indian child such that further inquiry might lead to a different ICWA finding by the juvenile court.  We accordingly affirm.

## BACKGROUND

### I.  *Prior Dependency History*

The family consists of mother, father, J.L., and their daughter E. (born in 2016). Mother also has eight other children, born between 1992 and 2010, all of whom were permanently removed from mother's care based on sustained allegations of drug use, neglect/endangerment, and mental illness.[2]

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     Father and mother's other children are not parties to this appeal.

Mother has an extensive prior child welfare history with the DCFS, as well as the same department in San Bernardino County, including more than 30 referrals between 1994 (when mother was 17 and her first child was two) and June 2019, including 12 substantiated referrals and six dependency cases. Mother's criminal history included misdemeanor convictions in 2002 for abandonment of a child and inflicting injury on a child, a conviction in 2005 for misdemeanor battery and felony petty theft with priors, and a conviction in 2008 for driving under the influence of drugs and alcohol.

In September 2016, the juvenile court sustained a prior dependency petition on behalf of E., based on allegations that mother had mental and emotional problems and had stopped taking her prescribed medication, placing E. at risk of serious physical harm. The court placed E. with mother with family maintenance services, ordering mother to participate in a parenting class, counseling, weekly drug and alcohol testing, and a drug treatment program, and requiring mother and E. to reside in a maternal uncle's home. Mother also completed a section 730 mental health evaluation.[3] The court terminated jurisdiction in June 2017. At that time, DCFS reported that mother was testing negative for drugs, doing well with her parenting classes and counseling, and her psychiatrist reported that mother was stable and did not currently need any medication.

In April 2018, DCFS filed another dependency petition on behalf of E., alleging that mother physically abused E. by pulling her hair and dragging her on the floor. The court terminated jurisdiction in July 2018, after DCFS recommended dismissal without prejudice because mother agreed to informal supervision. The voluntary family maintenance plan included random drug and alcohol testing for mother and mental health services for both mother and E. DCFS stated that mother participated in the plan from June 2018 to March 2019, at which time the court found mother in compliance and closed the case.

In the four months between the closure of informal supervision in March 2019 and the July 2019 referral at issue here, DCFS received four additional referrals concerning mother and E. In April, a reporting party alleged general neglect and emotional and physical abuse. DCFS determined

---

[3]     We granted mother's request for judicial notice of this evaluation.

the allegation to be inconclusive as to neglect and unfounded as to abuse. In May, a party alleged general neglect following an alleged incident of domestic violence between mother and her male companion. DCFS determined the report was unfounded. The same day, DCFS received a separate report of general neglect after mother appeared disoriented and unable to walk straight during her counseling session, at which E. was present. DCFS determined that report was inconclusive.

In June, DCFS received a report of general neglect from E.'s school, stating that E. had been missing a lot of school and was displaying increasingly disruptive behavior, including biting mother. E. attended a special education class for speech and language delay, but attended on average only two days per week and was one to two hours late on the days she did attend. The caller reported that mother and E. generally appeared unkempt and mother appeared to be on drugs. E. often arrived with a dirty diaper and once arrived with a dirty backpack containing spoiled milk. Mother also used curse words when speaking to E. Mother denied the allegations and agreed to receive informal services. She was referred to mental health services and the referral was closed on July 19, 2019. However, the mental health service provider later reported that mother cancelled numerous appointments and failed to complete an intake for these services.

## II. *Referral and Petition*

On July 25, 2019, DCFS received an emergency response referral alleging general neglect of E. (then three years old) by mother. The reporting party stated that mother and E. were referred for therapy and had an initial session at mother's home on July 23, 2019. The session was conducted outside because the floor was covered with items and there was no room to walk or sit. During the session, mother was struggling to keep from falling asleep. Mother reported that she had been discharged from her own therapy due to attendance issues. E. ran in and out of the house during the session and drew all over her face. Mother appeared disorganized and confused, and the reporting party expressed concern for mother's ability to supervise the child.

4

A DCFS children's social worker (CSW) met with mother and E. on August 1, 2019 at DCFS's office. Mother stated that the referral was "bull shit" and she was doing everything her prior social worker told her to do. She reported that she and E. were both enrolled in mental health services, although she did not know what type of services E. was receiving. Mother stated that DCFS was "out to get her" and she was no longer taking prescribed medication because she did not need it. During the interview, the CSW observed E. running around the lobby, at one point approached by a security guard to slow down. When the CSW twice directed mother's attention to E., mother stated that the child was fine. Mother told DCFS that she had no contact information for father other than that he lived in Las Vegas, Nevada.

The CSW contacted mother's therapist on August 2, 2019, who reported that mother was no longer enrolled in services because she had not met the attendance requirements since June 21, 2019. The therapist also stated that mother had been inconsistent with E.'s appointments since February, and that mother had once dozed off during a session. The therapist reported that E. was diagnosed with "unspecified disruptive, impulse-control and conduct disorder," and that medication was being considered. However, because of the inconsistency with attendance, medication had not been prescribed.

Another therapist reported that mother stopped attending therapy in May, last saw her psychiatrist in January, and was last prescribed her medication in January. The therapist observed that mother had "limited insight into her mental health." Mother walked into the office of the mental health services provider on August 12, 2019 and inquired about reconnecting with services. The provider told DCFS that it could not schedule an appointment with mother because she was "so unreliable" and did not have access to a working phone. Mother was told to return the following week.

Between August 6 and 13, 2019, the CSW made multiple unsuccessful attempts to contact mother. Mother had previously reported that her cell phone was broken and/or lost.

DCFS spoke with E.'s doctor on August 16, 2019, who reported that E. was diagnosed with generalized seizure disorder and developmental disorder. E. had been diagnosed with the seizure disorder in January 2019 and was

prescribed medication. The doctor reported that she had observed mother fail to provide E. with adequate supervision.

The court detained E. from mother on August 16, 2019 and placed her in foster care. In the detention report, DCFS assessed the risk level to E. from remaining with mother as "very high" and opined that mother's "history and current lack of follow through regarding psychiatric treatment for herself" and E. posed a risk of harm to E.

DCFS filed a dependency petition on August 20, 2019 on behalf of E. under section 300, subdivision (b)(1).[4] In count b-1, the petition alleged that mother "has a history of mental and emotional problems, including diagnosis of Bipolar Disorder and [S]chizoaffective Disorder which renders [her] incapable of providing regular care and supervision" of E. and which resulted in prior dependency proceedings for E. and permanent placement services for E.'s sibling, R. The petition further alleged that mother failed to "regularly participate in mental health counseling," or take her prescribed psychotropic medication. Count b-2 alleged that E. "has behavioral issues including diagnosis of unspecified disrupted [*sic*], impulse control and conduct disorder" and that mother "failed to ensure the child received regular mental health services since February 2019." In the Indian Child Inquiry Attachment (CWA-010(A)), DCFS reported that it had made the required inquiry and that E. "has no known Indian ancestry."

Mother completed a Parental Notification of Indian Status form (ICWA-020) on August 21, 2019. She checked the box stating, "I have no Indian ancestry as far as I know."

Mother appeared at the detention hearing, but DCFS had not been able to locate father.[5] The court found a prima facie case for jurisdiction over E.

---

[4] Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: . . . [¶] (b)(1). The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child."

[5] The court found father to be the alleged father of E., as he was not present at her birth, did not sign the birth certificate, had not held himself out as the parent, and had not contributed to supporting the child.

under section 300. The court ordered E. removed from both parents and ordered her continued placement in foster care. The court also ordered monitored visitation for mother. The court also found that it had no reason to know E. was an Indian child within the meaning of ICWA. The court ordered mother and father to keep their counsel, DCFS, and the court apprised of any new information relating to possible ICWA status.

### III. *Jurisdiction/Disposition Report*

DCFS filed a jurisdiction/disposition report on September 17, 2019. DCFS reported that it had not been successful in locating father.

DCFS attempted to interview E. on September 10, 2019, but E. was unable to provide much meaningful information due to her age. E. stated that she missed mother and "papa," mother's boyfriend. She also said that mother's boyfriend "yells at me and he yells at my mom." E.'s caregiver reported that E. was doing well, was almost potty-trained, was eating and sleeping well, and consistently took her medication.

A CSW met with mother on the same day. They met at DCFS's offices after mother stated she did not want DCFS to come to her home because it was dirty. Mother told the CSW that she had not done anything wrong and wanted to regain custody of E. She acknowledged losing custody of her other children, but stated "that was a long time ago," and "[t]hings are different with this baby." Mother also stated that her boyfriend of three years loved E. and E. called him "papa." Mother reported that she had been attending counseling but she no longer needed therapy and was "okay now." She stated that her doctor told her she no longer needed medication but she would take it if it meant getting E. back. Mother denied missing therapy and doctor appointments for E., stating that she was "just looking for another therapist and another doctor" and that E. was "doing fine."

Maternal uncle told DCFS that he no longer lived with mother, but visited her often. He stated that he stopped living with mother because her "living habits are not sanitary," but mother loved E.

Mother's therapist spoke with DCFS on September 12, 2019. He reported that mother had been inconsistent with her therapy visits and had missed several months of appointments with her therapist and her psychiatrist, but that in September mother had been calling the office or

7

showing up almost daily. He also stated that mother's current diagnoses were depression and anxiety. DCFS recommended that mother complete a new 730 evaluation to help determine her current mental health status.

DCFS also reported that E.'s current caregiver did not want to continue to monitor mother's visits with E., because mother acted inappropriately during a visit and would not stop her behavior when instructed to do so. In addition, mother's FaceTime phone call with E. was cancelled after mother gave the phone to her boyfriend who acted inappropriately with the child.

In a last-minute information filed September 24, 2019, DCFS noted that on two occasions, mother asked to meet at the DCFS office because her home was not clean. Mother also admitted that she had not been taking her prescribed psychotropic medication or attending therapy regularly.

## IV. *Adjudication and Disposition*

At the adjudication and disposition hearing on September 24, 2019, the court found notice of the proceedings was not proper as to father, and continued the matter to November 12, 2019. DCFS filed a last-minute information on October 28, 2019, reporting that mother was having monitored visits with E. at the DCFS office. Mother acted appropriately with E. and brought toys for E. to play with. DCFS filed another last-minute information on November 12, reporting that mother continued to have appropriate monitored weekly visits with E. DCFS also reported that mother was not enrolled in any programs and she was "adamant" that she was not willing to enroll in further programs because she had already completed the requirements of her last case and felt she had done nothing wrong. E. was doing well in her placement, had some improvements in behavior, and was consistently taking her medication to prevent seizures. DCFS therefore changed its recommendation to the court, urging the denial of reunification services to mother, given her failure to reunify with her other children, and her non-compliance and unwillingness to work with DCFS on a case plan to reunify with E.

The court continued adjudication and ordered DCFS to submit a supplemental report regarding mother's disability assessment and department attempts to locate relatives for possible placement. In a last-minute information on December 4, DCFS reported that mother had

presented at the North Los Angeles County Regional Center for assessment in September 2019, but failed to provide the necessary documents including medical and educational records. The Center reached out to the high school mother said she attended, but it had no record of her attendance. Thus, the Center stated that the assessment could not be completed. Although mother had previously denied having contact information for her other children, she ultimately provided DCFS with contact information for multiple relatives, including several of her adult children. DCFS identified mother's cousin as a potential placement for E.

The adjudication hearing proceeded on December 9, 2019. Mother testified that she did not currently have a mental health diagnosis. She stated that she and E. had been going to counseling for the past four years. She also said that she had an appointment for later in the month with the County Department of Mental Health to get a diagnosis and she was prepared to take any medication prescribed. She was taking parenting classes, meeting with her Narcotics Anonymous sponsor, and had been sober for the past five or six years. Mother also testified about her efforts to meet E.'s needs, including participating in counseling and taking medication.

E.'s counsel noted that mother's testimony was directly in conflict with the evidence from her care providers regarding her consistency and need for medication. The court sustained count b-1 as to mother, amending the allegations to include depression and anxiety as mother's current diagnoses. The court dismissed count b-2. The court found jurisdiction over E. under section 300, subdivision (b)(1). The court also found by clear and convincing evidence that it was reasonable and necessary to remove E. from her parents and that DCFS made reasonable efforts to prevent removal. The court denied reunification services as to father. Over the objection of counsel for DCFS and E., the court granted reunification services to mother with monitored visitation three times per week. The court warned mother that it was giving her a chance, but if she did not complete her case plan, the court would consider terminating reunification services. Mother's court-ordered case plan required her to complete eight random or on-demand consecutive drug tests, with a full drug rehabilitation program for any missed or dirty

tests, a parenting program, individual counseling, and mental health counseling, including taking all prescribed psychotropic medication.

## V.    *Period of Review*

DCFS filed a status review report on June 4, 2020 in advance of the six-month review hearing pursuant to section 366.21, subdivision (e).  E. continued to live with her foster caregivers and DCFS reported that she had "fully adjusted" and "formed a healthy attachment" to that family. Her caregiver stated that E. had greatly improved, having fewer tantrums, sleeping and eating well, progressing in her toilet training, and improving in her speech.  E.'s clinical service providers also reported that she had made significant progress.

DCFS reported that mother had failed to comply with her case plan. Mother's mental health providers stated that she was being treated for anxiety disorder and was not currently under medication treatment.  On May 18, 2020, mother's therapist stated that she had not been consistent with her participation.  The CSW enrolled mother for random drug testing on December 31, 2019, but mother was a "no show" for testing on the nine dates scheduled following her enrollment.  Mother also failed to make progress in completing her court-ordered parenting program.  Mother was inconsistent in her monitored visits with E., as she was "constantly late," and sometimes missed a scheduled visit.  During visits, the DCFS monitor reported that mother was "continuously on her phone" and did not pay attention to E. Mother also had FaceTime visits with E., but she often put her boyfriend on the phone with E. Both the CSW and E.'s caregiver told mother that her FaceTime visits would be cancelled if she allowed her boyfriend to have phone contact with E.

DCFS also stated that when mother visited the DCFS offices, she was "always inappropriately dressed, yells, screams and uses inappropriate language when talking to staff."  Mother also called the CSW and caregiver after 10 or 11 p.m. and sent them "irrelevant text messages."  Mother continued to state that E. was taken from her for no reason and appeared "volatile" and "scattered" when meeting with the CSW.  On May 14, 2020, mother told the CSW that she was being evicted and would be moving to Nevada.  Mother subsequently failed to return repeated calls from DCFS.

DCFS also reported that a new referral was generated on May 19, 2020, alleging that mother's boyfriend sexually abused E. According to E.'s caregiver, the child was observed "self-stimulating" and then told the caregiver that "it is ok" because "her daddy did it" to her. The caregiver stated that E. referred to mother's boyfriend as her "daddy," and that E. also said that the boyfriend had showed E. his penis. According to the caregiver, mother had not had contact with E. in approximately a month, but the last time they had a FaceTime call, mother allowed her boyfriend to speak to E.

DCFS recommended terminating family reunification services for mother, finding that continued services would not be beneficial to E. given mother's failure to make efforts to comply with her case plan.

In June 2020, the court granted DCFS's ex parte application seeking a forensic interview of E. in light of the allegations of sexual abuse by mother's boyfriend. DCFS reported that mother denied any possibility of sexual abuse and became defiant and aggressive with the CSW. Mother also refused to consent to a forensic interview for E. or otherwise cooperate with DCFS's investigation.[6]

After the six-month review hearing was continued because of the COVID-19 pandemic, DCFS filed a status review report on August 27, 2020. DCFS reported that E. "continues to thrive" with her caregiver, whom she called "mommy" and to whom she was strongly bonded. E. no longer had daily tantrums, she was able to verbally express her wants and needs, her nightmares had decreased, and she was sleeping through the night. This report of progress was echoed by E.'s mental health providers. On August 3, 2020, E.'s provider team reported that E. had met all of her goals and would be referred to individual therapy as she no longer needed the same intensive level of therapy. E.'s current caregiver was unable to adopt E., so DCFS was continuing to look for family members who could provide permanent placement for the child.

As for mother, DCFS reported that she remained non-compliant with her case plan. She was in individual therapy but "has been unable to grasp the issues" that initiated the case, continuing to state that E. was removed

---

[6]     E. was given a forensic interview in July 2020, but she was distracted and unable to answer basic questions.

from her for no reason. She also continued to send irrelevant text messages to the caregiver and the CSW and to call the caregiver at inappropriate times, despite being told not to do so. Mother also failed to comply with the schedule for FaceTime visits with E., missing scheduled calls and instead calling "at all hours of the day and night." Mother revealed that she had not intended to move to Las Vegas, as she had previously reported to DCFS, but made that claim in an attempt to get E. back sooner.

Mother's clinician at the mental health center reported that she had recently attended sessions only sporadically. Her individual therapist stated that mother was consistent but did not employ any of the tools or recommendations discussed during her sessions. Thus her therapist opined that mother's therapy was "stagnant" as she could not understand why her daughter was removed from her care and therefore could not move forward with any goals. Mother failed to submit to the approved drug testing between December 2019 and June 2020. However, as of August 6, mother had completed eight parenting classes, with additional classes on hold due to the pandemic. DCFS concluded that E.'s risk level was very high and again recommended terminating services for mother.

The six-month review hearing proceeded on September 11, 2020. Mother's counsel requested six more months of services, arguing that she had been making efforts to comply with her case plan. He stated that mother was turned away from the DCFS approved drug testing site because she had COVID symptoms, but that mother had enrolled in an outpatient program and had been drug testing there. Mother also claimed that the reports that her visits with E. were inappropriate and that she allowed her boyfriend contact with the child were false. Both DCFS and E.'s counsel again requested that the court terminate services for mother.

The court continued mother's reunification services, finding that mother had been making some effort to meet with her therapist and address her mental health issues, taking her parenting classes, and visiting E. The court reminded mother to comply with her case plan, and that she was not to contact the caregiver or allow her boyfriend to attend her visits with E. The court cautioned mother, "you are on notice that this is your last opportunity to demonstrate to this court that the child can be safely returned to you," and

12

that the court would terminate reunification services at the next hearing if mother was not in compliance.

DCFS filed a status review report on February 23, 2021 in advance of the scheduled 18-month review hearing. DCFS reported that E. had "sporadic" calls with mother, who was inconsistent in her participation. Mother had partially complied with her case plan, as she had completed a parenting program and was participating in individual therapy. However, she had not submitted to drug testing or enrolled in a full drug rehabilitation program, and did not follow through with seeing a psychiatrist as recommended by her therapist. DCFS noted that mother "appears to be gravely affected by mental health symptoms including . . . paranoia, and audio hallucinations." Mother continued to lack insight into her situation, stating that she did not understand why E. was removed. When asked why she missed calls with E., mother claimed that her phone had been hacked.

In February 2021, mother's therapist reported that mother had delusions, paranoia, trouble perceiving things as they are and grasping reality, poor insight, and a hard time processing and understanding. She opined that mother was not mentally able to care for her child and was seriously affected by her mental health symptoms. The therapist referred mother to a psychiatrist.

Mother claimed that she was never told that she was enrolled in random drug testing. Mother told the CSW she had submitted to drug testing through a different service, and submitted negative test results for six dates between August and November 2020. The drug program provider told DCFS that mother previously participated in substance abuse meetings, but she no longer attended. The provider observed that mother had abrupt mood swings, did not follow directions, and could not sit still or pay attention.

N.W., the non-relative extended family member acting as mother's visitation monitor, reported that the visits were poor in quality, as mother often talked to herself and laughed uncontrollably for long periods of time and then refused redirection. Mother also had abrupt changes in mood. N.W. stated that mother's mental health seemed to have deteriorated. Mother continued to miss scheduled video visits.

Because of issues with E.'s caregiver, DCFS planned to place E. on an emergency basis with N.W., who stated she was willing to adopt E. E. told DCFS that she missed mother but would like to live with N.W.

DCFS noted that mother had partially complied with her case plan but continued to display severe mental health symptoms, including paranoia and hallucinations. DCFS stated that the issue that brought the family to the department's attention had not been resolved, and that mother "may need more intensive services and possibly medication." DCFS concluded that while mother "appears to genuinely love and care for" E., she "is not able to appropriately and safely care of her at this time." DCFS again recommended termination of services for mother.

In a last-minute information on March 5, 2021, DCFS reported that mother had enrolled in a substance abuse program, but the program counselor stated mother was not participating in any of the program's requirements. Mother's therapist reported that mother attended six sessions between August 2020 and February 2021.

E. was placed with N.W. on March 1, 2021. DCFS reported that mother had been calling and harassing N.W.'s employer, despite the CSW's requests that she stop. Mother also called and texted the CSW excessively, often with nonsensical messages. The CSW also stated that phone calls with mother were difficult as she "does not appear to have any insight on her mental health symptoms" and did not understand why DCFS was not returning E. to her. When the CSW explained the department's concerns, mother would become enraged, yell, and use profanity.

The court held the review hearing on March 11, 2021. Once again, DCFS and E.'s counsel recommended terminating services for mother. Mother's counsel argued that mother was in substantial compliance with her plan, given her participation in therapy, parenting classes, drug testing, and visitation, and that there was no substantial risk to E. if she was returned to mother. The court found that the evidence demonstrated that mother's "mental health issues are still very much in play." Thus, the court found that continued jurisdiction was necessary, it would be detrimental to E. to return her to mother, and that mother had made only partial progress toward alleviating or mitigating the causes necessitating placement. The court

14

terminated reunification services for mother and set the matter for a permanency planning hearing.

## VI. *Termination*

DCFS filed a section 388 petition on May 25, 2021, seeking to modify the prior court orders by terminating mother's visitation. DCFS reported that it had ongoing issues with mother's visitation and her "untreated severe mental health has impeded consistent, purposeful, and meaningful visitation" with E. For example, DCFS stated that mother failed to appear on April 7, 2021 for a scheduled visit with E. at a local park at 1:00 p.m. When the CSW called mother, she sounded "drowsy or sleepy" and asked her neighbor for a ride to the visit. The CSW advised mother that they would only wait a half hour. At 1:30 p.m., when mother had not arrived, the CSW left with E., who was crying and upset that mother was not there. Mother texted the CSW at 1:50 p.m. that she had arrived for the visit. When informed that the visit had been cancelled because of mother's late arrival, mother began swearing at the CSW. The following week, the CSW spoke with mother's neighbor, who had been allowing mother to use her phone for contact with DCFS. The neighbor stated that she would no longer do that, as mother was "mean, disrespectful, and aggressive" toward the neighbor and that living next door to mother had been the "worst year of her life" because of mother's erratic behavior. The neighbor stated that mother was a "scary person and she should not be given her child."

On April 26, 2021, the neighbor told DCFS that mother was harassing her, asking to use her phone and claiming that E. had been kidnapped by N.W. The neighbor reported that mother was banging on her door at 2:00 a.m., demanding to use the phone. She also reported an incident in which mother came out of her home screaming and pulling her pants down.

On May 6, 2021, the CSW and E. arrived for a scheduled visit with mother at 12:00 p.m. Mother was not there, and when contacted, she appeared confused about the time and location of the visit. After mother arrived at the visit, she spent most of the time on her phone and talking about the case, despite repeated redirection from the CSW to focus on E. While in E.'s presence, mother also repeatedly referenced having a mental breakdown the day before and asked the CSW if she could take E. home with

her. Mother told the CSW, "I feel like running away" with E. and asked him what he would do if she took E. and ran away. Mother stated that she planned to kidnap E. that day. As the CSW and E. started to leave, mother began walking behind them, laughing spontaneously. Mother's substance abuse counselor also reported that mother had expressed thoughts of kidnapping E. during visitation.

N.W. told DCFS that following the visit with mother, E. had two toileting accidents and woke up crying from nightmares. She also reported that since the visit, E. had regressed to baby behaviors. E.'s therapist sent a letter to DCFS expressing her "observations and findings regarding the deleterious impact of E[.]'s visitations with her mother." The therapist opined that "the documented severity of [ ] mother's profound and untreated mental health issues (possible schizophrenia and active substance use) cause E[.] considerable trauma as evidenced by significant regressive behaviors, emotional dysregulation, and encopresis." The therapist noted that during sessions, when asked about mother, E. "almost instantly reverts to regressive language and behavior." She concluded that the "degree and severity of E[.]'s regressive behaviors speak to the severe stress she experiences in relationship to visitation with her mother."

DCFS changed mother's visits from in-person to virtual due to her statements regarding kidnapping. Mother missed the next scheduled virtual visit on May 13, 2021, causing E.'s mood to change from excitement to sadness when she realized the visit had been cancelled. DCFS opined that E.'s visits with mother were detrimental to E. and creating a barrier to E.'s treatment.

DCFS filed a section 366.26 report on June 17, 2021. DCFS reported that about June 1, 2021, mother called law enforcement stating that E.'s caregiver, N.W., had kidnapped the child. Mother also called the CSW, falsely claiming the court had authorized E. to be returned to her. Mother's counselor stated that mother was having a "psychosis episode." Approval of N.W. for adoption was still pending. DCFS recommended termination of parental rights as to both mother and father upon approval of N.W.'s home study.

At a hearing on July 8, 2021, both DCFS and E.'s counsel asked the court to grant DCFS's section 388 petition and terminate visitation for mother in the best interests of the child. The court noted it was generally reluctant to limit visits but that the record was "quite substantial and concerning" regarding the harm to E. from her visits with mother. The court found that DCFS had met its burden, but rather than ending visitation entirely, the court reduced mother's visitation schedule to monitored visitation once every two weeks. The court cautioned mother about the importance of following the rules during visitation and "modeling the best behavior that you can."

Mother filed a section 388 petition on September 3, 2021.[7] She requested the transfer of her case to family court and return of E. to her custody, stating that "I did everything I'm supposed to." She claimed to have provided the eight required drug tests, and that her completion of classes was delayed by the COVID-19 pandemic. She attached a certificate of completion for parenting classes, negative drug test results, and a letter confirming her monthly counseling.

DCFS filed a status review report on September 13, 2021, in advance of the hearing scheduled for the same day. DCFS reported that E. was doing well in her placement with N.W. and N.W.'s children, and appeared to be "comfortable, safe, and bonded" with that family. E. expressed that she liked living there and appeared well adjusted in the home. She continued to have weekly therapy sessions. E. stated that she liked having visits with mother because mother "buys her things." N.W. reported recently changing her phone number because mother "continued to harass her by continuously sending her pictures and inappropriate text messages." The CSW observed that N.W. was invested in E.'s safety and well-being, and expressed her desire to adopt E.

DCFS also reported that mother had lost her housing and had been living in a shelter for the past three months. She had maintained communication with the CSW, but continued to state that E. should return to her care because she had complied with the court's orders. The CSW also

_____

[7]     Although mother was represented by counsel throughout the proceedings below, she filed the section 388 petition herself.

stated that mother's mental health appeared to be deteriorating, detailing several recent anxiety attacks, and suggesting that "mother needs more intensive services perhaps even inpatient." The CSW observed that "mother loves her child and is actively advocating for herself to get E[.] back, but unfortunately, mother is not in a position" to provide for E.'s safety and well-being.

Mother provided DCFS with paperwork confirming that she had been prescribed mood-stabilizing medication in August of 2021 and was continuing monthly counseling. The CSW reported that he had monitored three visits with mother since August 15, 2021 and those visits went "fairly well" because mother was more receptive to him than the prior CSW assigned to the case. However, during the visit he had to "continuously redirect" mother away from talking about the case. The CSW observed that E. was excited to see mother, but regressed into talking in a baby voice during visits. Mother often brought multiple toys to each visit, and the CSW observed that E. spent more time opening the toys and asking mother to buy more toys than playing with mother. DCFS reported that N.W.'s home was approved for adoption and that N.W. was cooperative with DCFS and dedicated to E.'s well-being. DCFS recommended continued adoptive planning for E.

In a last-minute information, DCFS provided a progress letter from E.'s therapist. The therapist expressed her continuing opinion that mother's mental health issues caused E. "considerable trauma." She also indicated that it was important to "highlight for the court" that according to N.W., when she informed E. of an upcoming visit with mother, E. "vomited and defecated on herself as well as demonstrated emotional dysregulation post visit. It is my ongoing clinical observation that this physiological reaction, in combination with regressive 'baby talk,' demonstrations of anxious attachment (disinhibited social interactions and continued insecure bids for attachment), a[n] observable transactional relationship with [mother] ('I miss the toys mom brings me' and 'I want toys from mom'), and emotional dysregulation pre and post visits, is continued evidence of the profound bio-psycho-social stress reaction E[.] experiences related to her interactions and relationship" with mother.

N.W. told DCFS that E. had recently exhibited increased bed wetting, behavioral issues, and nightmares in which a monster was going to get her. E. stated that the monster in the dreams was mother's boyfriend who had been accused of sexually abusing E.

The CSW reported that mother exhibited "odd" behavior during a visit on August 26, 2021. Mother was talking to herself and was not attentive to or playing with E. Mother denied being under the influence of any substances.

The court held the permanency planning hearing on September 13, 2021. Both DCFS and counsel for E. requested that the court terminate parental rights, proceed with adoption, and designate N.W. as the prospective adoptive parent.

The court summarily denied mother's section 388 petition without a hearing, finding mother had not demonstrated a change in circumstances. As to terminating parental rights, mother's counsel argued that mother had maintained regular visitation with E. and that the child would benefit from continuing the relationship. She noted that E. referred to mother as "mama Rita," demonstrated sadness when mother was unable to attend a visitation, and happiness when mother arrived at visits, indicative of a strong parent-child bond. Mother addressed the court directly, arguing that she had done everything that was asked of her, she had "been in compliance the whole time," and that DCFS was "not even respecting me."

The court found that continued jurisdiction was necessary and by clear and convincing evidence that E. was adoptable. The court further found that mother had not played a sufficient parental role or established a bond with the child and that any benefit to E. from her relationship with mother was outweighed by the physical and emotional benefit she would receive through the permanency and stability of adoption. The court found that adoption was in E.'s best interests and by clear and convincing evidence that it would be detrimental to E. to be returned to her parents. The court also found that no exception to adoption applied and therefore terminated mother's and father's parental rights. The court further found that DCFS complied with the case plan by "making reasonable efforts, including whatever steps are necessary to make and finalize the permanent placement" of E. The court designated

N.W. as the prospective adoptive parent.  At the conclusion of the proceeding, mother was escorted from the courtroom after she was disruptive for several minutes while the court was making its findings.  Mother then began swearing and stating that "I'm not going to accept that . . . . I'm going to steal my baby then."

Mother timely appealed.

## DISCUSSION

### I.    *Denial of Section 388 Petition*

Mother contends that the juvenile court erred in summarily denying her section 388 petition. She argues that she made a prima facie showing of changed circumstances based on her compliance with the case plan and the best interests of the child, and therefore the court abused its discretion by failing to conduct an evidentiary hearing.  We disagree.

#### A.    *Legal Principles*

Pursuant to section 388, a parent may petition the juvenile court for modification of any previous order based upon changed circumstances or new evidence.  (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)  A parent may seek relief under section 388 even after the juvenile court has terminated family reunification services.  Section 388 thus acts as an "'escape mechanism'" for a parent facing termination of his or her parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  "After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests. [Citation.]  Section 388 allows a parent to rebut that presumption by demonstrating changed circumstances that would warrant modification of a prior court order."  (*In re Alayah J., supra*, 9 Cal.App.5th at p. 478)

To obtain modification of an order under section 388, the parent must demonstrate, by a preponderance of the evidence, both a change of circumstances or new evidence, and that the proposed change is in the best interests of the child.  (*In re Alayah J., supra*, 9 Cal.App.5th at p. 478; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)  In evaluating a section 388 petition, the juvenile court may consider factors such as "the seriousness of the reason leading to the child's removal, the reason the problem was not

20

resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner." (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616; see also *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.) The analysis is a searching one; the court may consider the entire factual and procedural history of the case. (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616.) "In assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.'" (*Ibid.*)

"To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Moreover, "[o]nce reunification services are ordered terminated, the focus shifts [from reunification] to the child's need for permanency and stability," and a presumption arises that "continued care [under the dependency system] is in the best interest of the child." (*In re Marilyn H., supra*, at pp. 309–310.) After reunification services are terminated, inquiry into a child's best interests includes consideration of his or her need for permanency and stability. (*In re J.C.* (2014) 226 Cal.App.4th 503, 526–527.)

On receipt of a section 388 petition, the court may either summarily deny the petition or order a hearing held. (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.) Section 388 petitions "are to be liberally construed in favor of granting a hearing to consider the parent's request." (*In re Marilyn H., supra,* 5 Cal.4th at p. 309; see also Cal. Rules of Court, rule 5.570(a).) However, in order to proceed to a hearing, the petitioner must make a prima facie showing in his or her favor. (*Ibid.*; see also *In re Marilyn H., supra*, 5 Cal.4th at p. 310.) "'There are two parts to the prima facie showing: The parent must demonstrate (1) [either] a genuine change of circumstances or new evidence, and . . . (2) [that] revoking the previous order would be in the best interests of the [child].'" (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079; see also *In re Kimberly F., supra*, 56 Cal.App.4th at p. 529; Rules of Court, rule 5.570(d)(1) & (2).) "'If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing.'" (*In re C.J.W., supra*, at p. 1079; see also *In*

*re Edward H.* (1996) 43 Cal.App.4th 584, 592 ["A 'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited."].) "'[S]pecific allegations describing the evidence constituting the proffered changed circumstances or new evidence' is required. [Citation.] Successful petitions have included declarations or other attachments which demonstrate the showing the petitioner will make at a hearing of the change in circumstances or new evidence.'" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250, citing *In re Edward H., supra,* 43 Cal.App.4th at p. 593.)

We review the juvenile court's summary denial of a section 388 petition for abuse of discretion. (*In re C.J.W., supra,* 157 Cal.App.4th at p. 1079.)

**B.** *Analysis*

The juvenile court found that mother failed to meet her initial burden to show both a genuine change of circumstances and that it would be in E.'s best interest to reinstate reunification services or return E. to mother's custody. As such, the court concluded mother was not entitled to an evidentiary hearing on her section 388 petition. We find no abuse of discretion in the court's summary denial.

The juvenile court did not err in finding that mother's petition failed to establish a prima facie case of changed circumstances. Indeed, nowhere in her arguments below or on appeal has mother explained what change in circumstances would support her request to return E. to her care.[8] In her petition, mother focused on her claim that she had "done everything [she was] supposed to" do, namely, completion of parenting classes, attendance at monthly therapy, and submission of eight negative drug tests. Crucially, this was the same information before the court when it terminated mother's reunification services and was therefore insufficient to establish any change in circumstances. Mother's petition contended that the court's finding of partial compliance with the case plan ignored her evidence. But the court explicitly noted that it was not terminating reunification for mother based on

---

[8]     In her briefing on appeal, mother repeatedly notes that she filed her section 388 petition in propria persona. But mother was represented by counsel throughout the proceedings, including at the hearing where her counsel argued on behalf of the section 388 petition.

minor details regarding drug testing (which mother claimed to have completed but DCFS contended was not at an authorized site or consecutive as required) or the parenting class (which mother was unable to complete because of the pandemic), but rather the court's ongoing concerns over mother's mental health issues.

Mother's focus on the portions of the case plan she completed ignores the court's previous findings regarding the persistence—and even worsening—of the issues that led to jurisdiction in the matter. Notably, mother's petition failed to address the reports by DCFS that mother's visitation with E. was inconsistent in frequency and deteriorating in quality, which had caused the court to reduce her visits and spurred observations by N.W. and E.'s therapist regarding the negative effects of the visitation on E. Mother also ignored additional evidence that her mental health issues were worsening, rather than improving, including the report of her continued harassment of E.'s caregiver and her refusal to cooperate with DCFS. Mother's claim that she fully "participated in such mental health services as were provided throughout the dependency" and that the court "denied" her additional necessary services is not supported by the record. Mother's care providers reported that she was inconsistent in attendance, or if she did attend, she was focused on her claim that she had been wronged by DCFS, both of which made it difficult to effectively diagnose and treat her. The record also shows that attempts by mother's therapists to schedule more frequent treatment or refer mother for psychotherapy and possible medication were met with resistance and refusal by mother. Neither mother nor her counsel ever requested additional mental health services; indeed, mother's section 388 petition asked the court to terminate jurisdiction, insisted she had complied with all requirements, and sought E.'s return to her care. Under these circumstances, it was not an abuse of discretion for the court to conclude that mother failed to make a prima facie showing that circumstances had changed in mother's favor since the termination of reunification services.

Moreover, it was within the juvenile court's discretion to conclude that E.'s interest in permanency and stability would not have been served by the requested change. At the time of mother's petition, E. had been involved in

the current dependency proceedings for more than two years, and had been the subject of repeated dependency referrals since shortly after her birth in 2016.  Mother's visitation with E. during the proceedings deteriorated to the point that she was allowed only bi-weekly, monitored, virtual visitation, and she was inconsistent in adhering to any visitation schedule or focusing on E. during visits.  As observed by N.W. and E.'s therapist, mother's visitation with E. was detrimental to E., leading to increased issues with toileting, nightmares, and regressive behavior.  Moreover, E. was well-cared for by and well-bonded with N.W. and her family, and N.W. consistently expressed her commitment to offer E. a permanent home.  "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests.  (*In re Edward H., supra*, 43 Cal.App.4th 584, 594.)  '[C]hildhood does not wait for the parent to become adequate.'"  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)  The court was not required to disrupt E.'s life at this late stage based on mother's claims here.

## II.   *Termination of Parental Rights*

Mother also contends the court erred in finding that the parental benefit exception to adoption did not apply and thereby terminating her parental rights pursuant to section 366.36. We find the court did not abuse its discretion in concluding that mother had not established the necessary exception.

### A.   *Legal Principles*

#### 1.   *Parental benefit exception*

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).)  If the juvenile court has decided to end reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'"].)  Thus, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental

rights," unless a parent can demonstrate one of the exceptions set forth in section 366.26 applies. (*In re Celine R*., *supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1); *In re Caden C*. (2021) 11 Cal.5th 614, 625 (*Caden C*.).)

The specified circumstances in section 366.26, subdivision (c)(1)(B) are "actually, *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R., supra*, 31 Cal.4th at p. 53.) They "'must be considered in view of the legislative preference for adoption where reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid*.; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

The exception at issue here is the parental benefit exception, which permits the selection of another permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C., supra*, 11 Cal.5th 614, our Supreme Court "discern[ed] three elements the parent must prove" to establish the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i). (*Id*. at p. 631.)

First, the parent asserting the exception must show "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C., supra*, 11 Cal.5th at p. 636.) This element is "straightforward," involving an assessment of whether the parent visits consistently. (*Id*. at p. 632.)

Second, the parent must show that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) In assessing whether the child would benefit from continuing the relationship with the parent, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and

the child's particular needs.'" (*Id*. at p. 632.) Thus, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.)

For the third element, the parent must show that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.) This evaluation consists of a "subtle, case-specific inquiry[,]" including consideration of whether "the benefit of placement in a new, adoptive home" outweighs the harm the child "would experience from the loss of [a] significant, positive, emotional relationship" with the parent. (*Ibid*.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.)

### 2. *Standard of review*

In *Caden C., supra*, 11 Cal.5th 614, our Supreme Court clarified the standard of review applicable for a juvenile court's findings regarding the parental-benefit exception. The first two elements—regular visitation and a beneficial relationship—involved determinations that were essentially factual; we therefore review those findings for substantial evidence. (*Id*. at p. 640.) The third element requires the juvenile court to determine whether any harm the child would suffer from the severance of the parental bond would outweigh the benefit to the child of adoption. (*Ibid*.) This requires a "hybrid" standard of review. (*Id*. at pp. 640-641.) Like the first two elements, the juvenile court must make a series of factual determinations including determinations about the child's relationship with a parent, which we review for substantial evidence. (*Id*. at p. 640.) However, "the ultimate decision—

26

whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

We also note that, unlike in *Caden C.*, the juvenile court here found that mother did not meet her burden of proving the exception. In such a case, where the trier of fact has "expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.) Thus, to the extent mother challenges the juvenile court's findings regarding her failure of proof, we determine whether the evidence compels a finding in appellant's favor as a matter of law, asking whether that evidence was uncontradicted and unimpeached and of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding. (*In re I.W., supra*, 180 Cal.App.4th at p. 1528.)

**B.   Analysis**

**1.   *No reliance on an impermissible factor***

Mother first contends that the juvenile court impermissibly relied on a requirement that she occupy a "parental" role with E. as part of its analysis of the parental benefit exception. She argues that under *Caden C., supra*, 11 Cal.5th at p. 278, the court cannot require a parent to show that he or she occupies a parental role in the child's life. We disagree that the court required such a showing here.

As acknowledged by the appellate court in *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210, "the words 'parental role,' standing alone, can have several different meanings." The phrase could reflect a proper analysis of the parental benefit exception, or it could reflect factors disallowed under *Caden C.* (*Ibid.*) As explained by the Supreme Court, a court may not rely solely on "[a] parent's continued struggles with the issues leading to dependency," such

27

as mental health or substance abuse, nor may the court assess "the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)," or "look to whether the parent can provide a home for the child." (*Caden C., supra*, 11 Cal.5th at pp. 634, 637.) Instead, the court must assess the strength and quality of the parent's relationship with the child and whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id*. at p. 638.)

Here, there is no indication in the record that the juvenile court improperly relied on mother's mental health struggles apart from its effect on her ability to form a substantial, positive bond with E. While mother argues that the court may not make an "arbitrary determination" that one home is better for a child than another or punish a parent for ongoing mental health issues, the record establishes the opposite. The juvenile court here extended mother multiple chances to maintain an appropriate relationship with E. over the course of several years, despite repeated objections from DCFS and E.'s counsel, and in the face of an extensive history that included mother losing custody of all of her other children. The record thus demonstrates that the court properly discussed and assessed the bond E. had with mother and whether that bond outweighed the benefits of E.'s adoption. As such, mother has failed to demonstrate error.

### 2.    *Case-specific inquiry*

Mother also argues that the juvenile court erred by failing to conduct the case-specific weighing required under *Caden C*. We disagree.

We reject mother's contention that the court failed to "engage in a subtle [and] detailed analysis of the nature of the relationship" between E. and mother, as required by *Caden C*. Other than her citation to the court's reference to a "parental role," mother does not elaborate on her contention that the court failed in its duties. To the extent mother contends the juvenile court was required to make specific findings in declining to apply the parental benefit exception, she forfeited that argument by failing to object below. (See *In re E.A.* (2012) 209 Cal.App.4th 787, 790–791.) In fact, the court's statement of its findings on the record at the hearing was repeatedly interrupted by outbursts from mother, requiring ongoing intervention by the courtroom bailiff. Moreover, the court was not required to explain its reasons

in refusing to apply the exception.  (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1156.)

We do not read the record here to suggest that the juvenile court's statements were "intended to be a comprehensive recitation of the grounds for its decision."  (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1156.)  Rather, the court's findings followed argument by all counsel as well as a statement by mother, and reflected its findings that mother had not demonstrated a strong bond with E. and that any benefit of continuing their relationship was outweighed by the benefits of adoption for E.

The court's finding that mother failed to establish the elements of the parental benefit exception is supported by ample evidence.  While mother contends she met the first element under *Caden C.*, requiring consistent visitation with E., we disagree.  The record reveals that mother was inconsistent with visitation, often missing visits, arriving late, or requiring a phone call from DCFS to remind her that it was occurring.  She also refused to adhere to an established schedule for FaceTime visits, instead calling the caregiver late at night.

Similarly, the record demonstrates that mother failed to establish the second element: that E. had a substantial, positive, emotional attachment to her.  (*Caden C., supra*, 11 Cal.5th at p. 632.)  To the contrary, E.'s therapist twice expressed her concerns to the court regarding the serious negative effects that mother's visitation was having on the child. These statements were echoed by N.W., who observed E. having increasing issues with toileting, nightmares, and other regressive behaviors as the visits with mother deteriorated.  There was evidence that E. had some bond with mother, as she called her "mama Rita" and seemed happy to see her. However, E.'s therapist noted that the relationship appeared largely transactional, which was supported by E.'s statement to DCFS that she liked when mother brought her toys and the observations during visitation that E. appeared more interested in the toys than in interacting with mother.  For her part, mother seemed to struggle with interacting with E. appropriately, requiring repeated redirection from the visitation monitors.

We also note that, in contrast to *Caden C.*, the record does not contain any evidence suggesting E. had difficulty separating from mother at the end

of visits or that E. had such an "intense" bond with mother that severing the relationship would lead to trauma such as emotional instability, acting out, difficulties in school, insomnia, anxiety, or depression. (*Caden C., supra*, 11 Cal.5th at p. 628 [relying on expert testimony].) Indeed, E.'s counsel agreed with the department's recommendation to terminate parental rights. Moreover, the record showed that E. was doing well in N.W.'s home and was bonded to N.W. and her family. Thus, the juvenile court was within its discretion to find that the benefits E. would gain through adoption by N.W. would outweigh any detriment she would suffer due to termination of her relationship with mother.[9]

On this record, we cannot conclude that the juvenile court abused its discretion by finding the benefits of placing E. in an adoptive home with N.W., a longtime family friend, outweighed any detriment she would suffer due to the loss of her relationship with mother. Thus, the juvenile court did not err in concluding mother failed to satisfy the parental benefit exception.

## III.   *ICWA Inquiry*

Mother argues that the court's finding that ICWA did not apply is invalid due to DCFS's failure to discharge its duty of inquiry into E.'s possible Native American heritage. DCFS responds that mother's denials of Native American heritage gave the court no reason to know E. was an Indian child. It further asserts that any inquiry error was harmless, as mother makes no affirmative representation of Native American heritage on appeal.

### A.   *Requirements*

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" (*In*

---

[9]   Notably, mother's statement to the court during the hearing demonstrated many of issues leading to the court's determination. She argued that she had been in full compliance with her case plan, suggested that DCFS was acting improperly, and ignored the concerns raised by the department, E.'s caregiver, and E.'s therapist regarding her relationship with E. She then began interrupting the court using profanity and threatened to "steal" E.

*re Isaiah W*. (2016) 1 Cal.5th 1, 7.) "ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.) California has incorporated many ICWA standards and requirements into state statutory law. (*In re Abbigail A.* (2016) 1 Cal.5th 83, 91.)

"In any given case, ICWA applies or not depending on whether the child who is the subject of the custody proceeding is an Indian child." (*In re Abbigail A., supra*, 1 Cal.5th at p. 90.) Both ICWA and state statutory law define an "Indian child" as a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); accord, § 224.1, subds. (a)-(b).) When a court "knows or has reason to know that an Indian child is involved" in "any involuntary proceedings in a State court," the agency seeking foster care placement of an Indian child is required to "notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention. . . . No foster care placement ... proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary. . . ." (25 U.S. § 1912(a).)

""ICWA itself does not impose a duty on courts or child welfare agencies to inquire as to whether a child in a dependency proceeding is an Indian child. [Citation.] Federal regulations implementing ICWA, however, require that state courts 'ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child.' [Citation.] The court must also 'instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.""" (*In re Y.W.* (2021) 70 Cal.App.5th 542, 551; see 25 C.F.R. § 23.107(a) (2021).) Additionally, state law "more broadly imposes on social services agencies and juvenile courts (but not parents) an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.'" (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741-742; see § 224.2, subd. (a); *In re Y.W., supra*, 70 Cal.App.5th at p. 551.)

31

"The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) The inquiry duty continues if a child is placed in the temporary custody of a county welfare department. (§ 224.2, subd. (b).) "Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (*Ibid.*) If this initial inquiry creates a "reason to believe" a child is an Indian child, DCFS is required to "make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e); *In re D.S., supra,* 46 Cal.App.5th at p. 1052.) If the further inquiry gives DCFS a "reason to know" the child is an Indian child, then the formal notice requirements set forth in section 224.3 apply. (§§ 224.2, subd. (d), 224.3, subd. (a); *In re D.S., supra,* 46 Cal.App.5th at p. 1052.) Alternatively, the juvenile court may find that a child is not an Indian child if the agency's "proper and adequate" inquiry and due diligence reveals no "reason to know" the child is an Indian child. (§ 224.2, subd. (i)(2); *In re D.S., supra,* 46 Cal.App.5th at p. 1050.)

"We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence." (*In re H.V.* (2022) 75 Cal.App.5th 433, 438; see also *In re D.S., supra,* 46 Cal.App.5th at p. 1051; § 224.2, subd. (i)(2).) If an inquiry is inadequate, we "must assess whether it is reasonably probable that the juvenile court would have made the same ICWA finding had the inquiry been done properly." (*Dezi C., supra,* 79 Cal.App.5th at p.777.) "If so, the error is harmless and we should affirm; otherwise, we must send it back for the Department to conduct a more comprehensive inquiry." (*Ibid.*)

**B.    *Analysis***

The record in this case unquestionably supports mother's contention that DCFS failed in its duty of inquiry. Aside from asking parents about their Native American heritage at the outset of the case, DCFS did not ask any of the several relatives and non-relative extended family members with whom it interacted whether E. or her parents might have Native American

heritage.  None of the reports, last-minute informations, or other filings give any indication that DCFS broached the topic with anyone other than mother, even though some of mother's relatives and non-relative extended family members were amenable to contact and forthcoming with information about the family.

DCFS suggests that the court's ICWA finding was sufficiently supported by mother's initial denial of Native American heritage, DCFS's due diligence in searching for father, and the court's admonition to mother to provide any new information regarding her heritage.  This assertion is unpersuasive. "Nothing in section 224.2, subdivision (b), relieves the Department of its broad duty to seek that information from 'all relevant' individuals [citation] simply because a parent states on the ICWA-020 form, . . . 'I have no Indian ancestry as far as I know.'" (*In re Y.W., supra*, 70 Cal.App.5th at p. 554.)  DCFS had a duty to inquire further and failed to do so.  This was error.

"Where, as here, there is no doubt that the Department's inquiry was erroneous, our examination as to whether substantial evidence supports the juvenile court's ICWA finding ends up turning on whether that error by the Department was harmless—in other words, we must assess whether it is reasonably probable that the juvenile court would have made the same ICWA finding had the inquiry been done properly." (*Dezi C., supra*, 79 Cal.App.5th at p. 777.)  This assessment has proved complex in the all-too-frequent context of inadequate ICWA inquiry. Various courts have devised at least four different analytical frameworks with which to assess whether a violation of ICWA's initial duty of inquiry is harmless.  "These rules exist along a 'continuum.'" (*Ibid*.)  At one end of the continuum is an approach that concludes "the error is in most cases ... prejudicial and reversible." (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 435; see also, e.g., *In re J.C.* (2022) 77 Cal.App.5th 70, 80-82.)  At the other end is an approach that treats the error as harmless unless the parent makes a good-faith claim of Native American ancestry on appeal.  (See *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069-1071; *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1388.)

The third and fourth approaches lie between these poles.  *In re Benjamin M., supra*, 70 Cal.App.5th at p. 744 holds that "a court must

33

reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where . . . there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." And *Dezi C., supra*, 79 Cal.App.5th at p. 779 holds that "an agency's failure to conduct a proper inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal."

For the reasons articulated in *Dezi C., supra*, we conclude the "reason to believe" test is the most appropriate approach. It "weaves together the test for harmless error compelled by our State's Constitution with the cascading duties of inquiry imposed upon agencies by our State's ICWA statutes," "reconciles the competing polices at issue when an ICWA objection is asserted . . . at the final phases of the dependency proceedings," and focuses "on what is in the record rather than what is not in the record." (*Dezi C., supra*, 79 Cal.App.5th at pp. 779-782.) It also minimizes the pitfalls that may result from the other approaches, including parental sandbagging, delay of permanence for children, and inadequate protection of tribes' rights. (See *id.* at pp. 784-785.) Under this approach, "a reviewing court would have 'reason to believe' further inquiry might lead to a different result if the record indicates that someone reported possible American Indian heritage and the agency never followed up on that information; if the record indicates that the agency never inquired into one of the two parents' heritage at all[citation], or if the record indicates that one or both of the parents is adopted and hence their self-reporting of 'no heritage' may not be fully informed." (*Id.* at p. 779.)

The record here provides no "reason to believe" E. is an Indian child. Mother informed DCFS she had no Native American heritage in August 2019 and did not provide any updated information throughout the proceedings. There is no information elsewhere in the record or in the appellate briefing suggesting otherwise. There is also no indication mother was adopted or unfamiliar with her biological history, such that her self-reports of no

heritage were unlikely to be fully informed.  As to father, mother had no contact information for him or any of his family members, and DCFS's efforts to locate him throughout the case were unsuccessful.  Under the In *C.* framework and the circumstances presented here, the inadequate ICWA inquiry is harmless.

## DISPOSITION

The orders denying mother's section 388 petition and terminating her parental rights are affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


WILLHITE, ACTING P.J.


CURREY, J.


35